**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**May 2, 2013**

# In the Court of Appeals of Georgia

A13A0464. RUSSU v. THE STATE.

PHIPPS, Presiding Judge.

In connection with her attempt to cash a $2,100 check, Olena Russu was charged with first degree forgery. A jury found her guilty, and she was granted first offender treatment and given a five-year, probated sentence. In this appeal, Russu argues that the evidence was insufficient to prove the intent element of the offense and that the trial court erred by rejecting her claim of ineffective assistance of trial counsel. We affirm.

1. When an appellant challenges the sufficiency of the evidence to support the conviction, "the relevant question is whether, after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[1]

So viewed, the state's evidence showed the following. At about 1:00 p.m. on June 28, 2010, Russu walked into a bank and presented to a teller the check at issue. The check was made payable to "Olena Russu." Russu signed the back of the check, provided the teller with two forms of identification, and placed her thumb print on the check. Aspects of the check, however, raised bank employees' suspicion of fraudulent activity. The bank manager placed a telephone call to the account holder, who told the bank manager that she had not authorized any such draft and instructed the manager not to honor the check.

The bank manager testified that, upon subsequent instruction from the bank's corporate security personnel, she asked Russu how she had obtained the check, and Russu answered that her husband had remodeled the account holder's kitchen and that the account holder had mailed the check to her husband.

Police were summoned. What Russu told the responding police officer about how she had obtained the check conflicted with what she had told the bank manager.

---

[1] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

The police officer testified that Russu told him that the "Daylight Company" had delivered the check to her via UPS. Upon further questioning by the officer, Russu stated that she was hired by that company to perform accounting and language translation work. Russu told the officer further that she did not know the account holder. The officer arrested Russu.

The state also called as a witness the account holder who testified that she had not written the $2,100 check and had not authorized the payment of any amount from her account to Russu. The account holder testified that neither Russu nor Russu's husband had done any remodeling work in her kitchen and that she (the account holder) had met neither Russu nor her husband.

Russu was the sole witness for the defense. She claimed that, when she attempted to cash the check, she did not know that it was counterfeit. She also denied making any statement at the bank on the day in question that the check had been provided to her husband as payment for construction work he had performed for the account holder. Russu claimed at trial that she apparently was misunderstood at the scene, testifying that when the bank manager asked her about being in possession of the check, she responded that she wanted to call her husband, who was in the business of constructing kitchen counter tops.

3

At trial, Russu gave details about her background. She had been born in the Ukraine, where she had lived until age 25 and had earned an MBA in finance. Subsequently, she had lived and worked for several years in Italy, before moving to the United States in about 2004. Russu was thirty-five years old at the time of the January 2012 trial; she had earned in the United States an associate's degree, and was expecting to graduate from an American college with a bachelor's degree within a few months of the trial.

Russu gave this account of how she had come into possession of the check. As a result of having posted her resume on the Internet, she began exchanging e-mails with an individual claiming to be the human resources manager for a "travel company" named Daylight Tour. According to one such e-mail received by Russu, Daylight Tour was "an entity organized and existing under international laws, with its head office located . . . [in the country of] Italy." Russu visited a website that the human resources manager identified as the company's, read materials faxed to her by the human resources manager, submitted to a "face to face" interview with a Daylight Tour company representative over the Internet using a web-cam, and conducted her own Internet research using the search engine Google, finding no negative information about Daylight Tour. Prior to being hired, Russu was required to "prove

4

[her] skills" by completing two unpaid assignments that involved bookkeeping and language translation.

Having thereafter accepted the company's offer of employment as a "travel coordinator," Russu was given her first task, which involved the check: the check would be delivered to Russu by UPS; when it so arrived, she had to cash it then send $2,000 by money order or cashier's check to a company agent she did not know, but whose name was provided in an e-mail; and all components of the task had to be completed within four hours of the starting time of the task. (Russu had been told that her compensation for successful completion of the check task was approximately five percent of the check amount.)

On appeal, Russu contends that the state's wholly circumstantial evidence of intent fell short of proving that she had the requisite criminal intent, maintaining that she was "dupe[d] in a scam seeking to take advantage of [her] burgeoning and naive familiarity with the United States." Russu asserts that her trial testimony, as well as the evidence of her actions at the bank – signing her own name on the check, providing valid identification to bank personnel, and putting her thumb print upon the check – demonstrated that she had no knowledge that the account holder had not written the check.

5

At the time of the act for which Russu was prosecuted, OCGA § 16-9-1 (a) provided,

> A person commits the offense of forgery in the first degree when with intent to defraud he knowingly makes, alters, or possesses any writing in a fictitious name or in such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority and utters or delivers such writing.[2]

"Both knowledge and intent to defraud may be proven by circumstantial evidence."[3]

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."[4]

> [Q]uestions about the reasonableness of hypotheses are generally for the jury's determination, and where the jury is authorized to find that the

---

[2] OCGA § 16-9-1 (a) (2010).

[3] *Collins v. State*, 258 Ga. App. 400, 401 (1) (574 SE2d 423) (2002) (punctuation and footnote omitted).

[4] OCGA § 24-4-6 (2012). "Georgia adopted a new evidence code effective January 1, 2013." *Leslie v. State*, 292 Ga. 368, 369 (2) (a), n. 3 (738 SE2d 42) (2013). See Ga. L. 2011, pp. 99, 214 § 101 (providing that the new evidence code "shall apply to any motion made or hearing or trial commenced on or after [January 1, 2013]"). Russu's trial was held in 2012.

6

evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the defendant's guilt, this Court does not disturb such finding unless the verdict of guilty is insupportable as a matter of law.[5]

In the instant case, the evidence showed that Russu attempted to withdraw $2,100 from an account belonging to an individual she neither knew nor had any prior dealings with, using a check she claimed had been delivered to her from a source essentially unknown to her. Although Russu gave an account which she maintains explained her innocent possession of the check and her lack of knowledge that the check was a forgery, "[t]he jury was entitled to reject [Russu's] explanation in favor of the circumstantial evidence of intent."[6] Indeed, under *Farmer v. State*,[7] the circumstantial evidence was sufficient for the jury to conclude that Russu knew that

---

[5] *Bryant v. State*, 282 Ga. 631, 634 (1) (651 SE2d 718) (2007) (citation omitted).

[6] *Connor v. State*, 268 Ga. 656, 657 (1) (492 SE2d 669) (1997) (citation omitted); see *Vaughn v. State*, 301 Ga. App. 391, 392 (687 SE2d 651) (2009) ("It is the jury's prerogative to choose what evidence to believe and what to reject. Issues regarding the credibility of witnesses are in the sole province of the jury and only the jury may analyze what weight will be given each witness's testimony.") (citation and punctuation omitted).

[7] 276 Ga. App. 443 (623 SE2d 545) (2005).

the $2,100 check she presented to the bank's personnel was forged.[8] And "[k]nowingly passing as genuine a forged instrument is conclusive of the intent to defraud."[9] The jury's guilty verdict was not unsupportable as a matter of law.[10]

Contrary to Russu's contention on appeal, a rational trier of fact could have found beyond a reasonable doubt that she was guilty of first degree forgery.[11]

2. Russu contests the trial court's rejection of her claim of ineffective assistance of trial counsel.

To prevail on an ineffectiveness claim, a defendant must establish, pursuant to *Strickland v. Washington*,[12] that counsel's performance was deficient and that the

[8] Id. at 444-445 (1) (rejecting claim that circumstantial evidence of criminal intent was insufficient to sustain first degree forgery conviction, where defendant cashed a $2,335.75 check and an $1,800 check made payable to him, the account holder was a construction company for which defendant had never worked, where checks had been provided to defendant by a man he had recently met and knew only as "Greg"; and finding no basis in claim that criminal intent was not established for reason that, when cashing the checks, the defendant had used his own name, supplied his valid identification, and placed upon the checks his thumb print).

[9] *Matula v. State*, 264 Ga. 673, 678 (2) (449 SE2d 850) (1994) (citation and punctuation omitted); see *Crowder v. State*, 218 Ga. App. 630, 632 (2) (462 SE2d 754) (1995).

[10] See *Farmer*, supra.

[11] See *Jackson*, supra; *Farmer*, supra.

[12] 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

8

deficient performance was prejudicial to his defense.[13] Both the performance and prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact.[14] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[15]

Russu complains that the jury was never shown the arresting police officer's incident report, claiming that her trial lawyer should have used the document to impeach the officer's credibility. She asserts that her trial lawyer either should have published the report to the jury as an impeaching document while the officer was on the stand or should have insisted that it be shown to the jury when it asked to see the report during deliberations.

Russu points out that the officer initially testified that she had given *him* conflicting accounts at the scene about how she had gained possession of the check. On direct examination, the prosecutor asked the officer, "So the first thing [Russu] told you was that her husband had done services and this was payment for his

---

[13] *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).

[14] *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[15] Id. at 88 (4).

services?" He answered, "Yes, ma'am." The prosecutor questioned the officer about the details of the bank scene and about Russu's demeanor, before returning to: "As the conversation with her went on, did her story change?" The officer responded, "Yes, ma'am, it did," elaborating that "later on in the conversation she told me specifically that she was being paid for accounting work and for being a translator."

Russu points out further that the officer's incident report, which Russu introduced as an exhibit at the new trial hearing, did not include any statement that Russu had told *the officer* any conflicting accounts about how she had obtained the check. Rather, the officer had recited therein:

> When attempting to get the check cashed, Russu stated that her husband worked on a kitchen and received the check as payment for the services provided. . . . I met with Russu . . . [and] asked Russu to explain how she obtained the check that she attempted to cash. Russu stated that she received the check . . . by UPS from "Daylight Company" for her work . . . .

The report itself, Russu urges on appeal, would have deflated the officer's credibility with the jury. That is, the report would have "canceled out the officer's prejudicial testimony of [her] alleged conflicting statements."

At the new trial hearing, Russu asked her trial lawyer why he had not introduced in evidence the police report. He answered:

> Well, in general I don't think police reports are helpful to the defendant's case when they're introduced in their entirety since they're created by an officer with adverse interest to my client. That's why I didn't introduce it. I tried to get the point across to the jury that his report was inconsistent with what he was testifying to. But I didn't feel any need to introduce the entire report because I felt like that wouldn't be helpful to us. . . . [T]here probably would have been just as much hurt as to help. I mean I tried to get across to the jury that his report was inconsistent with what he was saying. But if the report had come in, it also includes the rest of the information about her behavior at the bank which was not helpful.

Hence, when Russu's trial lawyer was later asked at the new trial hearing why he had not sought to show the jury the police report when it asked to see it during deliberations, he reiterated the position he had taken.

Indeed, the trial transcript shows that, on cross-examination, Russu's trial attorney elicited the officer's testimony that his report did *not* include any statement that Russu had told *him* that the check was payment for work performed by her husband. And more specifically, the attorney elicited the officer's testimony that his report contained the statement: "When attempting to get the check cashed, Russu

11

stated that her husband worked on a kitchen and received the check as payment for the services provided." The attorney clarified through additional testimony elicited from the officer that that statement was based entirely on what banking personnel had told him once he arrived at the scene. The trial transcript shows further that, during closing argument, Russu's trial lawyer revisited the issue, positing that there was "some doubt about . . . whether [Russu] told a different story." Thus, as a result of Russu's trial lawyer pursuing this line of cross-examination, then following up during closing argument, the jury was apprised and reminded of the discrepancy Russu cites on appeal as between the officer's direct testimony (that Russu told *him* "conflicting" accounts) and the officer's own incident report (that did not state that Russu told *him* a conflicting account).

Plainly, the alleged deficiencies in Russu's trial counsel's performance were decisions made as matters of trial strategy.[16] Although Russu's trial lawyer did not pursue the specific tactics of impeachment she cites on appeal, given the foregoing,

---

[16] See *Payne v. State*, 289 Ga. 691, 697 (3) (b) (715 SE2d 104) (2011) (decisions about what questions to ask on cross-examination are quintessential trial strategy); *Washington v. State*, 276 Ga. 655, 659 (3) (a) (581 SE2d 518) (2003) (manner in which an attorney attacks the credibility of a witness falls within ambit of trial tactics).

Russu did not overcome the strong presumption that the tactics employed by her trial lawyer fell within a wide range of reasonable professional assistance.[17]

Finally, Russu has shown no reasonable probability that, but for the fact that the jury did not see the police officer's report itself, the outcome of her trial would have been different.[18] The jury was informed by the officer himself of what Russu cites as the salient points: despite the officer's testimony on direct examination, the police officer's report contained no statement that Russu had made conflicting stories to the officer and she had not given the officer two conflicting accounts of how she had obtained the check. Nevertheless, the jury was presented other evidence that Russu had given conflicting accounts as to how she had obtained the check. The bank manager testified that Russu had claimed to her that the check was in payment for her

[17] See *Strickland*, supra at 689 (III) (A) (a court must indulge a strong presumption that counsel's conduct falls within wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy); *Farris v. State*, 290 Ga. 323, 326 (3) (720 SE2d 604) (2012) (same); *Battise v. State*, 295 Ga. App. 833, 839-840 (2) (f) (673 SE2d 262) (2009) (rejecting claims that trial counsel was ineffective for not impeaching witness with specific evidence).

[18] See *Miller v. State*, 285 Ga. 285, 286 (setting forth the appropriate test for determining prejudice: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."), quoting *Strickland*, supra at 466 U. S. at 694 (III) (B).

husband's construction work. Russu, however, testified that the check had been sent to her as payment for her own work at "Daylight Tour," which account was presented to the jury also through the officer. In light of these circumstances, Russu failed to demonstrate the requisite prejudice based upon trial counsel's decision not to show the jury the officer's incident report.

The trial court did not err in rejecting Russu's claim of ineffective assistance of trial counsel.

*Judgment affirmed. Ellington, C. J., and Branch, J., concur.*